2013 COA 125

**CAPITALVALUE ADVISORS, LLC, a Colorado limited liability company, d/b/a CapitalValue M & A LLC, a Colorado limited liability company, Plaintiff–Appellant,**

v.

**K2D, INC., a Colorado corporation, d/b/a Colorado Premium Foods; Kevin LaFleur; Don Babcock; and Triton Capital Partners, Ltd., an Illinois corporation, Defendants–Appellees.**

**Court of Appeals No. 12CA1396**

Colorado Court of Appeals, Div. II.

Announced August 15, 2013

Fairfield and Woods, P.C., Charles F. Brega, Lee Katherine Goldstein, Matthew Rork, Denver, Colorado, for Plaintiff–Appellant

Faegre Baker Daniels LLP, Darrell M. Daley, Jennifer M. Sullivan, Katherine W. Wittenberg, Megan M. Farooqui, Boulder, Colorado, for Defendants–Appellees

Opinion by JUDGE BOORAS

¶ 1 Plaintiff, CapitalValue Advisors, LLC, doing business as CapitalValue M & A, LLC (CapitalValue), appeals the district court's orders granting summary judgment in favor of defendants, K2D, Inc., a Colorado corporation, doing business as Colorado Premium Foods, and its owners, Kevin LaFleur and Don Babcock (CPF), and Triton Capital Partners, Ltd. (Triton). We reverse and remand with directions.

## I. Background

¶ 2 CapitalValue is a capital advisory firm. In December 2008, CapitalValue and CPF entered into an engagement agreement (the Agreement) whereby CapitalValue contracted to help sell K2D, Inc. or otherwise obtain funding to alleviate its seasonal cash flow shortages.

¶ 3 In July 2010, CPF hired Triton—a different capital advisory firm – and terminated the Agreement with CapitalValue. Shortly thereafter, CPF obtained a $57 million line of credit from U.S. Bank.

¶ 4 After learning of the loan from U.S. Bank, CapitalValue informed CPF that under a twenty-four-month "tail provision" in the Agreement, CPF owed it 4.5% of the total value of the loan. CapitalValue thereafter filed suit against CPF, alleging breach of the Agreement, unjust enrichment, and tortious interference with contract and prospective business advantage.

¶ 5 CPF counterclaimed, asserting, as relevant here, that because CapitalValue did not hold the requisite securities or real estate licenses, the Agreement was void in violation of securities and real estate licensing statutes.

¶ 6 CapitalValue later amended its complaint, adding Triton as a defendant and asserting claims against Triton for tortious interference with contract and prospective business advantage, and unjust enrichment.

¶ 7 CPF moved for summary judgment on CapitalValue's breach of contract and unjust enrichment claims, arguing the Agreement violated the Colorado real estate brokerage statute, section 12–61–101, C.R.S.2012. CPF later filed a second motion for summary judgment on the same claims, asserting that because CapitalValue agreed to market K2D, Inc. without first obtaining the requisite securities licenses, the Agreement was void in violation of state and federal securities laws. Triton likewise moved for summary judgment on CapitalValue's tortious interference with contract and unjust enrichment claims.

¶ 8 CapitalValue responded, admitting that, at the time it entered the Agreement, it was not a licensed securities or real estate broker. Nevertheless, CapitalValue contended that the Agreement provided compensation for CapitalValue's efforts to secure CPF a business loan; that securing the loan re-

quired no licenses; and that this portion of the Agreement was severable and enforceable.

¶ 9 In a series of three orders, the district court granted CPF's and Triton's motions for summary judgment.

¶ 10 In the first order, the court found that CapitalValue was not a licensed real estate broker, but that it nevertheless contracted to market K2D, Inc., which held a leasehold interest in real property. Therefore, the court concluded that the Agreement violated real estate brokerage licensing laws. The court further found that the Agreement provided for debt financing in addition to marketing K2D, Inc., but that this debt financing provision was not severable as a matter of law. The court thus found the entire Agreement unenforceable and granted CPF's motion for summary judgment on CapitalValue's breach of contract and unjust enrichment claims.

¶ 11 In the second order, the court concluded that the Agreement was also void and unenforceable as it violated securities laws. Specifically, the court found that the agreement violated the Securities Exchange Act of 1934 and the Colorado Securities Act, section 11–51–101, C.R.S.2012, because it called for CapitalValue, an unlicensed securities broker, to market CPF's stock. In addition, the court found that because CPF's stock was not registered with the Securities and Exchange Commission, any offer to sell that stock violated the Securities Act of 1933. Hence, the court again granted CPF's motion for summary judgment on CapitalValue's breach of contract and tortious interference claims.

¶ 12 In the third order, the court granted Triton's motion for summary judgment on CapitalValue's tortious interference and unjust enrichment claims. Relying on its earlier rulings that the Agreement was void and unenforceable in violation of real estate and securities laws, the court concluded, "it logically follows that it is not possible for Triton to have tortiously interfered with a void contract, and therefore, Triton could not have been unjustly enriched by such alleged interference."

¶ 13 CapitalValue appeals these orders.

## II.  Summary Judgment

¶ 14 We review a summary judgment de novo. *Shelter Mut. Ins. Co. v. Mid–Century Ins. Co.*, 246 P.3d 651, 657 (Colo.2011). Summary judgment shall be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." C.R.C.P. 56(c); *accord Civil Serv. Comm'n v. Pinder*, 812 P.2d 645, 649 (Colo.1991).

## III.  Severability

¶ 15 CapitalValue contends that the district court erred in concluding that, as a matter of law, the Agreement was not severable. We agree.

### A.  Terms of the Agreement

¶ 16 At the outset, we reject CPF's contention that the Agreement did not cover debt financing.

¶ 17 Contract interpretation is a question of law that we review de novo. *Ad Two, Inc. v. City & Cnty of Denver*, 9 P.3d 373, 376 (Colo.2000).

¶ 18 In interpreting a contract, our primary goal is to determine and give effect to the intent of the parties. *Id.*; *see also Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo.1990). We determine the parties' intent by examining the language of the instrument itself. *Ad Two, Inc.*, 9 P.3d at 376. "Written contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language." *Id.*

¶ 19 Here, as the district court found, the plain language of the Agreement clearly provided that CapitalValue would seek to secure a loan on CPF's behalf:

In executing this Agreement, [CapitalValue] is committing its resources to provide

you the best possible representation in the sale of your business, and in turn, you are granting [CapitalValue] the sole, exclusive, and irrevocable right to procure parties ("Buyer(s)") to purchase, exchange, lease, invest in, *loan to,* contract for the services of, or otherwise obtain an interest in the Client's business, its corporate stock, business assets, right and properties or any portion thereof of Client or Client's affiliates (the "Transaction").

(Emphasis added.)

In addition, the Agreement set forth that CapitalValue would earn 4.5% of the total amount secured for "debt financing for [CPF]." The term "debt financing" certainly encompasses a bank loan. *See Black's Law Dictionary* 707 (9th ed.2009) (defining "debt financing" as "[t]he raising of funds by issuing bonds or notes *or by borrowing from a financial institution.*") (emphasis added). Therefore, we conclude that under its plain language, the Agreement provided that CapitalValue was entitled to a percentage of loans it procured from financial institutions on behalf of CPF.

¶ 20 Because we conclude that the Agreement provided for CapitalValue to work on CPF's behalf to secure debt financing, we turn to CapitalValue's contention that this portion of the Agreement was severable from its unenforceable provisions.

### B. Severability as a Matter of Law

¶ 21 CapitalValue contends that the district court erred in concluding that severing the Agreement would eviscerate real estate licensing laws. We agree.

¶ 22 Where a contract contains multiple provisions, some of which cannot be legally performed, the remaining provisions are not necessarily unenforceable. *Reilly v. Korholz,* 137 Colo. 20, 27, 320 P.2d 756, 760 (1958). Rather, "[w]here an agreement founded on a legal consideration contains several promises, or a promise to do several things, and a part only of the things to be done are illegal, the promises which can be separated, or the promise, so far as it can be separated, from the illegality, may be valid." *Id.* (quoting 17 C.J.S. Contracts § 289).

Hence, "a lawful promise made for a lawful consideration is not invalid merely because an unlawful promise was made at the same time and for the same consideration." *Id.*; *see also Carter v. Thompkins,* 133 Colo. 279, 283, 294 P.2d 265, 267 (1956) ("Certain portions of this contract being in contravention of the [plumbers' licensing] statute are unenforceable, but as to those portions not in violation of the licensing statute, the contract is severable and plaintiff may recover any unpaid balance due him for the materials furnished and labor performed not requiring the services of an unlicensed plumber.").

¶ 23 Contracts that are "severable" are frequently viewed as a number of promises that constitute "more than one" contract, as opposed to only one contract. *See John v. United Adver., Inc.,* 165 Colo. 193, 199–200, 439 P.2d 53, 56 (1968) (contract for construction, installation, and maintenance of seven signs was severable where payment was apportioned per individual sign and contract included a termination and modification clause); *see also In re Buffets Holdings, Inc.,* 387 B.R. 115, 120 (Bankr.D.Del.2008) ("The issue is whether the parties intended a single contract even though it may be expressed in separate agreements or whether they intended separate contracts even though they are 'bundled' together in one agreement."); *Penske Truck Leasing Co. v. Huddleston,* 795 S.W.2d 669, 671 (Tenn.1990) ("An agreement can be either an entire contract or a severable contract according to the intention of the parties, and the fact that divisible parts are included within the same document does not preclude them from being considered and enforced as separate contracts.").

¶ 24 In determining whether a contract is severable, "[t]he primary objective is to ascertain the intent of the contracting parties, as such intent is manifested by not only the several terms and provisions of the contract itself, but also as such are viewed in the light of all the surrounding circumstances, including the conduct of the parties before any dispute has arisen." *John,* 165 Colo. at 198–99, 439 P.2d at 55–56. Furthermore, "whether a number of promises constitute one contract, or more than one, is to be determined by inquiring 'whether the parties

assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out.' " *Id.*, 165 Colo. at 199, 439 P.2d at 56 (quoting *United States v. Bethlehem Steel Corp.*, 315 U.S. 289, 298, 62 S.Ct. 581, 86 L.Ed. 855 (1942)).

¶ 25 Here, in its order concluding that the Agreement was void in violation of the real estate licensing statute, the district court did not ascertain the intent of the parties in concluding that the contract was not severable, but rather relied on the reasoning in *Broughall v. Black Forest Development Co.*, 196 Colo. 503, 593 P.2d 314 (1978). The court quoted the following passage from *Broughall* :

> [The individual plaintiff's] services consisted of finding a buyer for a radio station, which in fact owned an interest in a leasehold, and, as such, his services clearly fell within the ambit of the [real estate licensing] statute. Severing the contract, as [the individual plaintiff] suggests, would emasculate the clear purpose of the statute, and would allow finders and business brokers to disregard completely the licensing requirement to the detriment of the public whom the statute is designed to protect.

196 Colo. at 506, 593 P.2d at 316.

¶ 26 The district court further reasoned that *Broughall* "was obviously concerned with giving 'teeth' to the real estate licensing statute and not allowing it to be weakened." The court thus concluded:

> With regard to the language of the contract here, there is no severability provision: the [Agreement] is silent as to whether different parts of it are either severable or not severable. Following the *Broughall* court's reasoning, this [c]ourt finds that allowing the contract to be severed would "emasculate" the purpose of the statute. Therefore, the [c]ourt finds that, because [CapitalValue was not a] licensed real estate broker[ ], the entire contract is illegal, void, and unenforceable.

¶ 27 We disagree with the district court's reasoning and conclude that *Broughall* is distinguishable. The contract in *Broughall* contained a single agreement—to find a buyer to purchase a business, including its real estate interest. 196 Colo. at 504, 593 P.2d at 315. After finding a buyer, Broughall argued that, though he was not a licensed real estate broker, his commission could be "based on that part of the sale price which did not involve real estate." 196 Colo. at 506, 593 P.2d at 316. The court ruled that "severing" the contract by simply discounting Broughall's fee "would allow finders and business brokers to disregard completely the licensing requirement to the detriment of the public whom the statute is designed to protect." *Id.*

■ ¶ 28 In contrast to the contract in *Broughall*, the Agreement contains multiple agreements. Specifically, the Agreement provides that CapitalValue would earn (1) 4.5% for a sale of less than a majority interest in K2D, Inc.; (2) 4.0% for a sale of more than a majority interest in K2D, Inc.; or (3) 4.5% for helping CPF obtain debt financing. CapitalValue does not appeal the district court's rulings that the first and second provisions call for selling a business that owns a real estate interest, and thus violate real estate licensing requirements. Nor does CapitalValue appeal the court's rulings that the first and second provisions violate federal and state securities licensing requirements. However, because the Agreement also contains a third provision for payment for securing debt financing that the parties do not contend violates either set of licensing laws, the district court erred in concluding that, as a matter of law, the Agreement could not be severed.

■ ¶ 29 Although the district court noted that the Agreement contained no severability provision, the court did not determine whether the parties intended that the Agreement would be severed if one or more provisions were invalid. The absence of a severability clause does not conclusively establish that the parties did not intend that the Agreement be severable. Moreover, the actions of the parties may be considered in determining their intent. Here, for example, according to the affidavit of the managing director of CapitalValue, at the request of CPF, CapitalValue contacted several entities whose only in-

terest was to loan CPF money, and not to acquire any assets or equity.

¶ 30 Because the parties' intent as to whether the Agreement was severable presents a disputed issue of material fact, the court should not have entered summary judgment. *Shelter Mut. Ins. Co.*, 246 P.3d at 657. Thus, a remand is necessary. *See John*, 165 Colo. at 197, 439 P.2d at 55–56.

### IV. "Void" in Violation of Securities Laws

¶ 31 CapitalValue further contends that the district court erred when determining that the Agreement was void, and thus not severable, in violation of state and federal securities laws. We agree.

¶ 32 The district court also granted CPF's request for summary judgment on an alternative ground, concluding that the Agreement violated the Securities Exchange Act of 1934 and the Colorado Securities Act, section 11–51–101, because it obligated CapitalValue to market CPF's stock even though CapitalValue did not have the requisite securities licenses. The court further concluded that the Agreement violated the Securities Act of 1933 because CPF's stock was not registered with the Securities and Exchange Commission. The court did not address CapitalValue's contention that the contract to help CPF obtain debt financing was severable from the Agreement's unenforceable provisions.

¶ 33 CPF contends that because two of the Agreement's provisions—earning 4.5% commission for selling less than a majority interest of K2D, Inc., or 4.0% for selling more than a majority interest in K2D, Inc.— violate securities licensing laws, section 11–51–604(10), C.R.S.2012, bars CapitalValue from basing its claims on violations of the Agreement's debt financing provision, which CPF does not contend violates securities laws. Section 11–51–604(10) provides in pertinent part:

No person who has made or engaged in the performance of any contract in violation of any provision of this article . . . or who has acquired any purported right un-

der any such contract with knowledge of the facts by reason of which the making or performance of any such contract was in violation may base any suit on the contract.

¶ 34 CPF's contention rests on the premise that the "contract" is the Agreement. Thus, if any portion of the Agreement violates securities laws, then section 11–51–604(10) precludes actions on the "contract." We are not persuaded, however, because a contract is simply a legally enforceable agreement. *See Black's Law Dictionary* 365 (9th ed.2009) (a contract is "[a]n agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law.").

¶ 35 Here, the single document—the Agreement—contains multiple promises, each of which may constitute a separate agreement or contract. Thus, if the court concludes that the Agreement is severable, section 11–51–604(10) will bar any claim based on the provisions that violate securities laws, but will not bar a claim based on the Agreement's debt financing provision.

¶ 36 Furthermore, relying on section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b) (2006), CPF contends that the Agreement is "void" and not severable. Section 29(b) provides, in pertinent part:

Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract . . . [1]

15 U.S.C. § 78cc(b).

¶ 37 As with section 11–51–604(10), we read the term "contract" in section 29(b) as

---

**1.** The Supreme Court has clarified that "[t]his

language establishes that the guilty party is pre-

voiding agreements made in violation of federal securities laws; not voiding all provisions of a document that contains multiple agreements. In this case, if the district court determines that the Agreement is severable, section 29(b) will not void the otherwise enforceable debt financing provision simply because it was memorialized on the same document as the unenforceable provisions. In sum, we reject CPF's contention that the entire Agreement was necessarily void in violation of state and federal securities laws.

### V. Unclean Hands

 ¶ 38 CPF contends for the first time on appeal that CapitalValue is barred by "unclean hands" from seeking to sever the Agreement. Because CPF did not so contend at the district court, we decline to address that argument for the first time on appeal. *See Giguere v. SJS Family Enters., Ltd.,* 155 P.3d 462, 470 (Colo.App.2006) (declining to address an argument raised for the first time on appeal).

### VI. Summary Judgment in Favor of Triton

¶ 39 CapitalValue contends that the district court erred in granting summary judgment in favor of Triton. Specifically, CapitalValue argues that the court predicated this summary judgment ruling on its earlier rulings that the Agreement was void and not severable.

¶ 40 The district court granted summary judgment in favor of Triton on CapitalValue's claims for unjust enrichment and tortious interference with contract and prospective economic advantage, concluding that because the Agreement was void and unenforceable, "it logically follows that it is not possible for Triton to have tortiously interfered with a void contract, and, therefore, Triton could not have been unjustly enriched by such alleged interference."

¶ 41 As discussed above, because the district court did not determine whether the parties intended that the Agreement be severable, a remand is necessary. We note that this determination may impact the court's summary judgment ruling in favor of Triton.

### VII. Conclusion

¶ 42 The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

JUDGE DAILEY and JUDGE FURMAN concur.

---

cluded from enforcing the contract against an unwilling innocent party, but it does not compel the conclusion that the contract is a nullity, creating no enforceable rights even in a party innocent of the violation." *Mills v. Elec. Auto–Lite Co.,* 396 U.S. 375, 387, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) (footnote omitted); *see also Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 469 F.2d 1166, 1182 (8th Cir.1972) (where party was not "unwilling innocent party," to absolve it of all contractual obligations would be an "inequitable and gratuitous result"). Moreover, a party seeking to rescind a contract under section 29(b) "must show that (1) the contract involved a prohibited transaction, (2) he is in contractual privity with the defendant, and (3) he is in the class of persons the Act was designed to protect." *Pompano–Windy City Partners, Ltd. v. Bear Stearns & Co.,* 794 F.Supp. 1265, 1288 (S.D.N.Y.1992) (quoting *Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.,* 678 F.2d 552, 559 (5th Cir.1982)).